Thank you, Your Honor. Frederick Carroll, I'm appearing for Mr. Yoahjan Lara Flores. He's going to be referred to as Mr. Flores, as he was in the briefs. I'm also arguing today on behalf of Alfredo Rubio Lara and Arturo Lara. Same issue, correct? Yes, Your Honor. And counsel for both of those defendants are present before the court today as well. All right. Good morning. Good morning, everyone. Good morning, Your Honor. And as a preliminary matter, if I may reserve two minutes for it. Sure. Thank you. This case comes to the court with a single issue for all three defendants. And it is whether or not this Colt M203 shoulder-mounted grenade launcher is a destructive device that requires a 15-level sentencing guideline enhancement upon conviction, rather than the two-level enhancement that the guidelines otherwise provide for. This is an issue where we're talking about definitions. The United States sentencing guidelines do not go to the definitions supplied by either the defense expert or the government's expert in this case. The definitions give us guidance as to what these complicated weapons systems are, but they don't necessarily dial in directly to the law. They are ways to inform us in applying those guidelines, but not a definitive NFA, for instance, definition in determining whether the guidelines are correct. When I read the district court, what do you wonder? The district court's order, did the district court make a legal determination or did he make a factual determination? He made a hybrid determination, Your Honor. He made a factual determination based on how this device actually operates in delivering the payload. And then he made a legal determination as to whether the 15-level guideline. So what did he base that legal determination on? He based it on the definitions provided by the experts. Here, to cut through a lot of the jargon with the weaponry, we have a distinction that the defendants are making between delivery and destruction. Here we have a device which can throw a grenade farther than a human arm could throw a hand grenade. However, it does not deliver a higher payload than a hand grenade. As noted on page 20 of the appellant's opening brief, it actually delivers a smaller payload. So we have a device capable of throwing the grenade farther, but not of causing more destructive damage, and that's not fitting. As I understood his ruling, he sort of tied his definition both to the – well, he carefully considered what the government's witness had to say. But he also tied it to the statute. That is correct, Your Honor. But the statute doesn't provide a definition of missile. No, no, sir. It does not. Our distinction here is made that – So how should it be defined as a matter of law? As a matter of law, this particular item should not be defined as a missile. No, that's not my question. How should it be defined? It should be defined simply as a grenade punishable by an enhancement of two levels rather than the destruction device. Why? Because it doesn't have the increased destructive capability. So what do we do when you're trying to define a term in a statute or in a regulation? What are the tools that the court should look to? The court looks to the definitions that the parties have provided and also common usage. The United States has argued that our common usage reliance on the term grenade launcher is mistaken and is logically – So what's the common definition of a missile? The common definition of a missile, if you combine the things that – Well, just give me one. I don't care. Pick any dictionary. A weapon with a payload deliverable by its own propellant system and perhaps having some sort of a guidance system is what's going to be a missile or rocket under the definitions that we're talking about. And it seems that that's clear within law enforcement that even the expert, Mr. McMichael, and Agent May testified that there's a gap between the – What was the guideline and what was the commission with the promulgation of this guideline attempting to get at? They were trying to get at an enhanced penalty for increased destructive weapons, increasingly destructive weapons. Specifically, the kind of things that could, as the government argued, go over a fence or a wall and cause more damage than another weapon. So it gets that 15-level bump in penalty under the guidelines because of its – But it seems like they were trying to deal with weapons that are kind of military-style type weapons. That's correct, Your Honor. Is that right? That's correct, Your Honor. These are not civilian weapons. That argument has not been made in any sense before the Court. But we're arguing that there is a big difference between destructive capability that is punished by the guidelines and delivery ability, which is simply saying, in this case, we have a different version, a more evolved version of a hand grenade, and instead of a human arm, mine would be very weak and Peyton Manning's would be very strong. And here we've got something that can actually throw the hand grenade 500 meters rather than humans' ability to throw it 30-plus meters. So at rock bottom, where was the district court wrong? The district court was wrong in finding that this was increasingly destructive and thus warranting the 15-level guideline enhancement, and secondly wrong by allowing the definition to come in rather than through some sort of a common agreement looking to definitions but just relying specifically on how Agent May characterized it, putting us in a situation where anything, where we're not certain what it would be, we'd go back to the agents to determine whether or not the guideline was correct. I guess I was trying to get at it indirectly with my first. It's generally the responsibility of the court to determine what a particular term means. Yes, Your Honor. Absolutely. And we are asking the court very carefully. And I'm not sure quite that the district court judge did that here. I agree, Your Honor. I agree. I don't believe that. That's why I asked you what is the definition that we, as an appellant court, should adopt. I think we can refer, I believe it's page 15 of the appellant's opening brief. I'm sorry, page 16. Under subheading 1, the M203 40-millimeter grenade launcher. And it should be defined as a grenade launcher, as stated from the government's exhibits, the transcripts in this case, and the record. In military parlance, it's a grenade launcher. Let me put it more bluntly, more directly. Please. If you were writing the opinion for this case, how would you define missile or, you know? A rocket. A rocket. That's what I'm trying to get at. A cartridge or weapons payload delivery device. Just imagine yourself. You get to write this. Either with its own guidance system attached or its own propulsion system. In this case. A self-propellant. Self-propellant, correct. Or in the parlance of these things, some things have a propellant system on the payload, which delivers at some later point. It kicks in a switch or something, you know, mercury switches and whatnot. This operates more like a shotgun, leaving behind the shell, leaving behind all of the propellant. All it does, like a rifle or a shotgun, when the firing pin hits the blasting cap, it creates an explosion. It does provide the 35,000 pounds per square inch of centrifugal force to propel the payload out, but that's it. There's no further delivery system. There is no further guidance system. From a destructive capability standpoint, why does the self-propulsion aspect of the weapon matter so much? Because it's not just lobbying something further, but it's taking it with a whole guidance system so that it might be more precisely delivered so that it's actually a payload. I think there are, you know, unguided missiles as well. So I don't think that's going to be, that wouldn't be a prerequisite I would impose on the definition. But I agree with you that most definitions I've seen of missiles seem to have this self-propulsion aspect to them. But I'm trying to match that up with what the Sentencing Commission was trying to do here. If they were focused on destructive capability, I mean, why does it matter if the thing has its own propulsion mechanism versus I've got a weapon that is, as you described, the propulsion mechanism that this weapon uses. It fires at a high, high rate of speed. I mean, the thing can penetrate a couple of inches of steel, right, at the right distance. With some cartridges, it might be able to. I think it was the testimony it could. And so its destructive ability, and I see that my time is running up, is predicated on, and I think defined in this case by the fact that it could go over a wall. It could go through a window of a vehicle and thus cause more destructive capability. Right. So why does it matter if it can't, if it's not self-propelled, that the weapon, the firing mechanism itself is the thing that propels it? It still has the same destructive capacity, no? Absolutely, Your Honor. I think you're getting to the exact point, one of the two that we're trying to make. Definitionally, this is not a missile or a rocket. For destructive purposes, it actually carries a lower destructive possibility, a lower payload than, say, a regular hand grenade. We're talking about half of an ounce of explosive versus one to one-and-a-half of a hand grenade, or considerably more for other things that get the application of the 15-level sentencing enhancement. So we have a definitional problem with destructive versus delivery. Here it's just delivery. And we also have a definitional problem because rockets and missiles have a different definition, both in terms of what our clients were trying to buy, trying to use, and even in what military parlance is than what this particular weapons delivery device does. You almost, you wanted to save a little time. I'll give you a minute for rebuttal. Thank you, sir. Okay. We hear from the government. Mr. Keene. Good morning. My name is Douglas Keene. May it please the Court, I am appearing on behalf of the United States. The parties need to be absolutely clear with the Court about the kind of weapon we're discussing today. The M203 40-millimeter cartridge is a very sophisticated launch weapon, not thrown, that contains more than a quarter ounce of explosive and is designed to calculate the number of revolutions it completes in flight so that at 37,000 turns, it arms itself in order to penetrate up to two inches of steel armor or, depending on design, explode fragmentation balls at chest height to shred human targets at up to 500 meters distance. The district court was not incorrect, did not err in its finding of fact, that this military weapon meets the statutory definition in the National Firearms Act. That doesn't strike me as a finding of fact. I think our task is to define for legal purposes what a missile is as it's used in sentencing guidelines, and we first have to come up with a definition, and then we can figure out whether this thing meets that definition, right? That's correct, Your Honor, and the Court adopted the National Firearms Act definition, and there is a definition in the National Firearms Act of a missile. Put most succinctly, it is actually very simple. It reads straight from the elements from the text and the context of the National Firearms Act, and it is. Where are you reading? I'm sorry, where are you reading from? What's the statute? From the National Firearms Act. It is. Are you talking about 48th? Yeah, I'm sorry, yeah, 5845. I'm sorry, Your Honor. 5845? That's right, it did, 26. 5845F, is that what you're looking at? Or just whatever you're going to read. I just want to be able to follow along. That's correct, Your Honor. Well, I'm putting it succinctly because the National Firearms Act is long, and the elements, as we've indicated in our briefing, are found all through the Act. And I can spell it out chapter and verse for you, but to give you the most succinct definition, because I think that's what the Court is looking for, is as follows. A National Firearms Act missile is a projected or propelled weapon, not thrown, containing more than a quarter ounce of explosive. Are you reading from something, or are you just saying that? No, that comes directly from the Act. I'm looking at F, that's not what F says. Well, bear with me, because if you've got the statute, you will find, I guarantee you, every one of those elements there. First, it's a four-step methodology, as we pointed out to the District Court and as the District Court accepted. Whether the device is intended or designed for use as a weapon, that is found at 26 U.S.C. section 5845 sub F. So it must be a weapon. Under some dictionary definitions, we might artfully describe a thrown coffee cup as a missile, but it's not in this statute. They're talking about something that is a weapon. Second step is whether the device is explosive, incendiary, or poison gas, in this case explosive. 26 U.S.C. section 5845 subsection F sub 1. Third step, whether the device falls within one of the enumerated characteristics, and we're using terms of common usage, and Congress did this to steer a nice middle course between hyper-technical definitions and super slang definitions. Whether the device falls within one of the enumerated characteristics of bomb, grenade, rocket, missile, mine, or similar device, in this case missile. Fourth, whether, in the case of a missile, the device also contains more than a quarter ounce of explosive, as distinguished from propellant, which is the definition for a rocket. That definition is there. That covers all four elements that were proposed to the District Court. It doesn't tell us what a missile is. Well, yes, we know this, again, from the text and the context of the statute. First of all, we know it's a weapon. We know that a term of common usage, a missile, is something that is thrown in a projectile. My concern is that when you look at the reason for the amendment for the 15-level enhancement, I mean, that's really what we're coming down to. They're not saying that it wasn't dangerous and that it wasn't going to, like, kill someone or do great harm. I think we can all agree to that. But they're saying it's a two-level enhancement instead of 15. And then when you look at the reason for the amendment, they were concerned about the destructive device being a manned portable air defense system, which I take to mean what you see, like, in the movies where you have terrorists that have something on their shoulder and they're shooting it at an airplane. Portable rocket, missile, or device used for launching a portable rocket or missile. Or a missile. Right, or a missile. That definition excludes rocket. It doesn't talk about rocket. It talks about missile. It talks about destructive devices. But the amendment seems to be particularly concerned about, I'm thinking, these types of things that you see in the movies or you see in training films where they have one person with this launching thing that aims it at something very far away, like a jetliner. That's so. . . And what the Court's thinking of is called a MANPADS. Right. And it's inartfully derived from an acronym. But the point is that it is an example. And the Commission is clear about this. That is an example of something that they were concerned with. That thing is radically different from the device we're talking about here, right? Well. . . As I understand it, that is self-propelled. It's not different in any of the relevant characteristics. But it is self-propelled, right? Well, for example. . . Is it self-propelled? I'm sorry? Is it self-propelled?  That would be a rocket. Is the MANPADS. . . No, no, listen to. . . Judge Watford can restate his question again. I'm sorry, Your Honor. The MANPADS device that's specified in this commentary we've got, is that thing self-propelled? The MANPADS example would be an example of a rocket, correct. Self-propelled. It contains its own propellant, which is the definition of a rocket, not a missile. That's why the Commission said rocket versus missile. We're not talking about a MANPADS. A MANPADS is just an example of something that was. . . that met the Commission's concerns. You'll notice that in the definition and in the Commission's articulation of why they were concerned, it wasn't about whether you saw it in the movies or it seemed to fit some inherent sense of what is a spooky, dangerous, hyper-technical weapon. It was whether or not you could use it for those three purposes that they were concerned with, which is, was it capable of harming large numbers of people if fired? Said specifically, fired. The M203 does exactly that. Does it pose inherent risk? Is it designed and intended for use as a weapon? The M203 does. Does it have no legitimate civilian purpose? The M203, again, is not a civilian firearm. It is a military firearm. And by the National Firearms Act definition, although it is a missile, we're not arguing that it's a rocket, it is just as dangerous and just as scary as the MANPADS in terms of all of the relevant characteristics that the Commission. . . I think the definition, if you wanted to go back to 5845F, I think F2, the definition there seems to capture exactly the thing we're looking at. And that's distinguished from missiles and rockets. I'm sorry, F2, whether it was a . . . Any type of weapon by whatever name known which will or which may be readily converted to expel a projectile. And that seems to capture exactly what this thing is. It's a projectile. We need to be very, very clear, because this is a very, very important point. The underlying offense is possession of the M203. That is how the M203 launcher. Imagine I have the launcher here, and over here is, and this is coming from the supplemental excerpt of record, is the explosive projectile. Possession of the launcher was the crime that the defendants were convicted of, well, conspiracy to possess. We can't give them one of these that actually explodes. This is what they wanted. The Commission is concerned with, was your launcher a device for use in launching a missile? So the device that they had in possession was also a destructive device under the National Firearms Act. The question before us today is, does it launch a missile? It just so happens that the National Firearms Act also defines missile. We must not be confused about that. The predicate offense was possession of the launcher. And you have correctly identified the definition that we used, and the parties agreed made the launcher a destructive device. The question for sentencing is, does it launch one of these? I would say that's a projectile. A projectile is a missile and a rocket, but you'll notice the National Firearms Act does not say projectile. It's very clear about which items it is most concerned about. Rockets and missiles were two of the enumerated characteristics, or two of the enumerated categories, and the Commission said, out of all of the categories that you've mentioned, which include grenade, for example, and we can talk about why this is not a grenade if the Court has any concern about that. Out of all of those enumerated categories, the two that concern us most are rockets and missiles. Here's an example of a rocket, and they give the MANPADS example because it satisfies us as civilians, because that is what we think of. But they were concerned with what it did. And if you were going to look at the category of missiles, they didn't give us an example of a missile. But if you look at the category of missiles, we would expect that something that meets the definition of a missile would not only meet the National Firearms Act qualifications, but would also address all of the concerns of the Commission. And the M203 40-millimeter projectile does exactly that. The weapon system as a whole is very dangerous, and it meets all of the technical standards as well as the scary standards that the Commission established. Roberts. Let me ask you, just in terms of legal sources that define missiles, is there one that leaves out the self-propulsion aspect? Because I haven't seen any definition of missile from not – forget about your expert. I'm talking about just sources we can turn to as judges. They all say it has to be self-propelled. Do you have one that says otherwise? I'm not aware of one that does say it has to be self-propelled, Your Honor. Okay, well. A missile can be any number of things. For example, an intercontinental ballistic missile. We all know what that is from the Cold War, right? That carries its own propellant. Under the National Firearms Act, that's a rocket, right? The military has never used the terms missile and rocket consistently, nor grenade for that matter. They are terms of art. And you know how they derive? They derive at the blueprint factory at Lockheed Martin. They use it as a brand name. And calling this a grenade launcher is really no different than calling this package of gum a bazooka. It doesn't make it a bazooka. It's simply a brand name. Grenade launcher is a brand name, not a deflection, and it is not relevant to the National Firearms Act. What's relevant are the statutory requirements, which, as we've explained in our briefing, are met to a T. And the commission's concerns, which, as I've explained here, are also met to a T, even if this doesn't seem viscerally like what we would expect to see in the movies. I don't know what dictionaries you were looking at, but Judge Watford, every dictionary I looked at, other than incidental use of a missile, it's defined. Just give me one from the Oxford English Dictionary, the definition, a long-distance weapon that is self-propelled. Well, we looked at the Webster's Dictionary, and it said, and it was even more expansive in the literary sense as an object that can be projected. The A definition, 2A in Oxford's, is an object propelled either by hand or mechanical as a weapon at a target. But that's by hand. Okay? So, but my question to the counsel there was, what was the commission trying to get at? It's this kind of military-style weapons that have a lot of destructive force and that have a certain military type. The commission was fairly explicit that it is a device capable of harming large numbers of people, if thrown, that it pose inherent risks and has no legitimate purpose. That is the M203. Now, we don't, we may begin with a range of dictionary or colloquial definitions, but we don't end there because the National Firearms Act is actually much more precise than it appears at first glance, which is why we wanted to make sure and go through each of those elements because they are all there in the text and the context of the statute. Does that help answer your question, Your Honor, if I've understood it correctly? No, not really. I guess you seem to think that it's this all-or-nothing 2 or 15 level proposition, and the guidelines themselves specifically say we've narrowed the 15 level enhancement to a very small category of weapons that otherwise meet the destructive device definition, but the court is obviously free to grant an upward departure if the particular device that otherwise only qualifies for two levels is more destructive than the ordinary one. It seems to me that's this case. It qualifies for two levels, but you've got all kinds of powerful arguments as to why the court should depart upward. Well, the court did depart upward, and the guidelines said if it happens to be a device for launching a rocket or a missile, and the court agreed that this is a missile, it goes up 15. And the commission was clear because they want to make absolutely certain that the statutory maximum applies after acceptance of responsibility because these are so serious. But it's different. Under the guidelines, if he has to impose, if the court has to impose an enhancement under the guidelines of 15, if he has to go to 15, he's got to do that. And then from there, if he wants to come down, then he has to exercise his discretion down. If it's only two levels, then it's a question of whether or not the judge is going to exercise discretion upward. That's correct. There's a difference. Well. I mean, you may say this is a destructive device. This is a serious matter. But I'm only going to go up eight levels. That captures, I think, you know, in the judge's perspective. Or you could say this is just so dangerous. It can cause so much damage that I think that I'm going to vary up to the 15. A court can do this. But we would argue that with the M203 weapon system, because it is a missile, the court must apply the plus 15. It's free to depart.  I appreciate that, Your Honor. Thank you, Your Honor. Judge Watford, I think, said it perfectly. This is a projectile, not a missile, not a rocket. Definitionally, we look to the definitions of missiles and rockets and things that warrant a 15-level enhancement. The projectile, in this case, does not meet that definition. This part of it is left behind, like a shell casing on a handgun or a shotgun shell. The top portion, the payload, is delivered, as Mr. Keene made a point of, at 35,000 square feet per minute in centrifugal force, just exactly like rifling on a regular handgun or rifle. It then increases the revolutions to 37,000. That's when it arms the business end of the rocket. That all stays behind. All it does is turn faster. It is, therefore, a projectile. It does not have any propulsion system. It does not have any guidance system. And it does not meet the definition. And as Judge Paez correctly noted, it could very literally be left to the court to go up or down. That's the court's decision. But definitionally, we don't have a match. Secondly, finally, it's very important that an enhanced ability for delivery, a better quarterback arm, is very, very different than a 15-level destructive device that is intended for ICBMs, MANPADs, the things that are very specifically delineated to warrant such a huge enhancement under the sentencing guidelines. That's why we're asking for resentencing, because the projectile, in this case, is not the missile, and it has an increased delivery system, not the increased destructive capacity that the commission wanted when determining that a 15-level guideline enhancement would apply to those other weapons. Thank you. Thank you. We appreciate the arguments very much. Very helpful. It's an interesting case. And we will submit the case at this time. And safe travels back to San Diego, all of you.
judges: Kobayashi, Paez, Watford